# UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF MISSOURI

*Not Designated for Publication*

| | |
|---|---|
| **In re:** | ) |
| | ) |
| **DEBORAH SUE KROESEN,** | ) Case No. 18-42624-can13 |
| | ) |
| **NANCE WERNES,** | ) |
|       **Plaintiff,** | ) |
|    **v.** | ) Adv. Case. No. 19-04003 |
| | ) |
| **DEBORAH SUE KROESEN,** | ) |
|       **Defendant.** | ) |
| **DEBORAH SUE KROESEN,** | ) |
|       **Plaintiff,** | ) |
|    **v.** | ) Adv. Case. No. 19-04022 |
| | ) |
| **NANCE WERNES,** | ) |
|       **Defendant.** | ) |

## MEMORANDUM OPINION

*Introduction*

These related matters come before the court on Creditor Nance Wernes' Complaint to Determine the Dischargeability of a Debt pursuant to 11 U.S.C. §§ 523(a)(2)(A)-(B) against the chapter 13 Debtor Deborah Kroesen[1] and Debtor Deborah Kroesen's Complaint for Damages and Injunctive Relief for violations of the automatic stay against Ms. Wernes.[2]

In short, this matter involves a house rehab gone awry among two people who had been friends. Ms. Wernes, who had invested in a home Ms. Kroesen proposed to rehab and sell, alleges that Ms. Kroesen defrauded her in connection with a promissory note entered between them on

---

[1] Adversary Proceeding 19-04003.
[2] Adversary Proceeding 19-04022.

June 20, 2018. Unfortunately, the project was never completed, the house was foreclosed upon by the first lienholder, and Ms. Wernes lost her investment. Ms. Kroesen denies any allegation of misrepresentation or false pretense in connection with the rehab project.

After Ms. Kroesen filed bankruptcy as a result of the failed rehab project, Ms. Kroesen filed a complaint against Ms. Wernes alleges that Ms. Wernes violated Ms. Kroesen's automatic stay by menacing Ms. Kroesen, warranting an award for damages, injunctive relief, and attorney fees. Ms. Wernes denies that she either menaced Ms. Kroesen or violated the automatic stay.

With the agreement of the parties, the court consolidated both adversary proceedings for purposes of discovery and trial. The court held a three-and-a-half-hour trial on both matters on February 25, 2020 and allowed the parties forty-five minutes each to present their closing arguments on March 3, 2020. The debtor, Deborah Kroesen, appeared by counsel Jennifer Benedict; the creditor, Nance Wernes, appeared pro se. At the end of closing arguments, the court took the nondischargeability issue under advisement, ruled in favor of Ms. Wernes on the violation of the stay issue, and reserved the right to submit its findings of fact and conclusions of law. The following constitutes the court's findings of fact and conclusions of law as required by Fed. R. Bankr. P. 7052 on both adversary proceedings.

## PROCEDURAL HISTORY

Before delving into the court's findings of fact and conclusions of law, the court recounts the lengthy procedural history of this chapter 13 case and the two related adversary proceedings.

### The chapter 13 case

- On October 4, 2018, Ms. Kroesen filed a chapter 13 petition. She scheduled Ms. Wernes on Schedule D as a secured creditor owed $90,000 against property described as "210 NW Donovan Road, Lee's Summit, MO 64063" (the "Donovan Property") with the notation,

2

"Jackson County Home purchased to be 'flipped' valued at $150,000." The Schedule I stated that Ms. Kroesen had been employed as a paralegal at the Jennifer Benedict Law Office for six years. Her chapter 13 plan proposed a monthly payment of $200/month with a 5% dividend to unsecured creditors and proposed that the Donovan Property be surrendered to Nance Wernes.

- After the chapter 13 trustee raised numerous confirmation issues, and after the filing of several amended plans, the court confirmed Ms. Kroesen's final amended plan paying $330/month for a base of 36 months was confirmed. Ms. Wernes did not object to confirmation of any of proposed plans.

- In the meantime, Crossroads Management Group, the holder of the first lien against the Donovan Property, filed a motion for relief from stay, alleging the validity of its first lien pursuant to a loan dated July 21, 2017 in the original principal amount of $143,000 incurred by Sisters' Property Solutions, LLC, a single-member LLC owned by Ms. Kroesen. Crossroads alleged a current payoff due of $154,606.40, in excess of the value of the Donovan Property scheduled by Ms. Kroesen in her Schedule A/B. The certificate of service does not reflect whether Crossroads notified Ms. Wernes as the second lienholder. No one objected and the court entered an order lifting the stay.

- Also in the meantime, Ms. Wernes timely filed her proof of claim, Claim No. 10-1. Her pro se claim was filed as a secured claim in the amount of $40,000 and unsecured in the amount of $110,422, for a total claim of $150,422. She listed the value of the Donovan Property as worth $200,000. She also requested priority treatment of $2,850 for deposits under 11 U.S.C. § 507(a)(7) and of $8,000 for taxes and penalties owed to governmental units under 11 U.S.C. § 507(a)(8). Her claim was supported by a copy of a Promissory

3

Note dated June 20, 2018 in the principal amount of $135,191.34 payable by August 14, 2018 in one installment of $134,191.34[3] plus interest payments of $4,828.26/month accruing at an interest rate of 48% beginning on June 14, 2018 (six days before the date on the Note). The Promissory Note stated that it was secured by a subordinate lien against the Donovan Property.

- The chapter 13 trustee objected to the claim.[4] The trustee objected to the priority treatment of a portion of the claim; alleged that the trustee was unable to administer the claim as filed due to the conflicting information regarding the claim type and claim amount; and requested that the claim be allowed as a secured claim in the amount of $150,422. Ms. Wernes did not respond to either objection and the court entered an order sustaining the trustee's objection. Ms. Wernes likewise did not object to the trustee's Notice Allowing/Disallowing claim showing her claim was to be treated as secured on a surrendered property to be paid a 0% dividend from the confirmed plan.

### The adversary complaints

- On January 5, 2019, Ms. Wernes timely filed her complaint of nondischargeability against Ms. Kroesen, Adv. No. 19-4003. The court entered a pretrial order setting a pretrial conference for February 26, 2019 and a trial setting of March 19, 2019.

- On February 26, 2019, the court held the first of many status conferences in the nondischargeability case. The plaintiff, Ms. Wernes, was represented by attorney Ryan Shernaman and Ms. Kroesen was (and remains) represented by attorney Jennifer Benedict. At this date, neither party had begun discovery and both represented that they did not need a scheduling order, so the court cancelled the trial date and set another status conference

---

[3] The court notes the discrepancy in the principal amounts but nothing in the record explains the discrepancy.
[4] Another objection by Ms. Kroesen's counsel Ms. Benedict was subsequently withdrawn before it could be heard.

for May 21, 2019, stating that the parties should be prepared to discuss a trial date at that conference.

- In the interim, on April 9, 2019, Ms. Kroesen filed her complaint for injunctive relief and damages against Ms. Wernes, Adv. No. 19-4022, alleging Ms. Wernes had violated the automatic stay. The court entered a pretrial order setting a status conference of June 3, 2019 (later corrected to June 4) and a trial date of June 25, 2019.

- On May 21, 2019, the court held a second status conference on the nondischargeability complaint. The parties stated they had both completed written discovery. Mr. Shernaman, representing Ms. Wernes, stated he intended to take Ms. Kroesen's deposition and that a half day would be sufficient to try the case. Ms. Benedict said she would need an hour. The court set a discovery cutoff of July 1, 2019, a final pretrial conference for July 2, 2019, and a trial for July 29, 2019.  Although the court raised the fact that the other adversary with the same parties was also pending, Mr. Shernaman stated Ms. Wernes had not retained him to defend her in the stay violation adversary.

- On June 4, 2019, the court held its first of many status conferences regarding the stay violation complaint. Ms. Wernes did not participate. Before the conference, Ms. Benedict had filed a motion for default judgment against Ms. Wernes, but the court denied the motion for failure of proper service, cancelled the June 25, 2019 trial date, and set a deadline for Ms. Benedict to request an alias summons and to re-serve the complaint. The court also noted that under Rule 55, the court would likely need a hearing to determine damages, assuming Ms. Wernes was properly served. After Ms. Benedict timely requested the alias summons, the court then entered an amended pretrial order setting a pretrial conference for July 2, 2019 (at the same time as the final pretrial conference in the

dischargeability adversary complaint) and a trial date of July 30, 2019 (the day after the trial in the other adversary was scheduled).

- Before the July 29 trial could occur in the dischargeability adversary proceeding, however, Ms. Wernes' counsel, Mr. Shernaman, filed a motion to withdraw. The court set the motion for hearing on the July 2, 2019 final pretrial conference.

- On July 2, 2019, the court held conferences in both cases. Ms. Wernes appeared pro se and stated she did not object to Mr. Shernaman's motion to withdraw but requested time to find another attorney. The court agreed to give her more time and cancelled the July 29 trial setting and set another status conference for July 30, 2019 when the trial in the stay violation proceeding had been set. The court warned Ms. Wernes that the discovery cutoff had expired on July 1, and that if she could not find another lawyer, she would have to proceed without one and that the court would set another trial date. In the stay violation adversary, although Ms. Benedict had served Ms. Wernes properly, the answer date had not yet expired but hearing no opposition to the trial date, the court kept the July 30 trial date. Ms. Wernes through new counsel, Nicky McNeil, filed an answer the next day.

- Neither the July 30, 2019 trial in the stay violation adversary nor the July 30 status conference in the dischargeability occurred on July 30, however. Shortly before the trial setting, Ms. Kroesen's counsel Jennifer Benedict requested a continuance for the purpose of conducting additional discovery and noting that Ms. Kroesen had undergone surgery "and would not be in a position to participate in trial on June [sic] 30, 2019." The court granted the motion to continue, cancelled the trial setting, and set another status conference in both adversaries for August 27, 2019.

- During the August 27, 2019 status conference, Mr. McNeil stated he intended to withdraw from his representation of Ms. Wernes in the dischargeability matter. The court set a deadline for Mr. McNeil to file the motion and for Ms. Wernes to object. (Mr. McNeil did timely do so and Ms. Wernes did not object and the court later granted the motion). During this status conference, both Ms. Wernes, now proceeding again pro se, and Ms. Benedict, on behalf of Ms. Kroesen, agreed to try both adversaries on the same day. Asked how much time she needed for her case and defense, Ms. Wernes stated she could present her case in an hour; Ms. Benedict said up to 90 minutes. Ms. Wernes stated she intended to file a motion to compel discovery against Ms. Kroesen but did not believe it would delay her ability to get ready for trial.  In anticipation of setting a trial, the court raised with Ms. Benedict whether the adversary proceeding was core since she had not been alleged in the complaint whether the matter was core. Ms. Benedict stated orally that it was. The court therefore set both a deadline for Ms. Wernes to file her motion to compel and to file a response to the allegation that the stay violation complaint was core, since Ms. Wernes' previously filed answer had not addressed the issue either. The court continued both proceedings to another status conference in October and said it would set a trial date at that time.

- Ms. Wernes did not file a motion to compel or file a statement about whether Ms. Kroesen's complaint was a core proceeding. Rather, at the October 10, 2019 status conference she stated she had served more discovery on Ms. Kroesen. Ms. Wernes had not filed a certificate of service with her discovery but Ms. Benedict represented her client's time to answer had not yet expired.  Ms. Benedict for her part did not object that the previous discovery cutoff had expired. The court set a new discovery cutoff of October 15 and set

another status conference for November 5, telling the parties that the trial would likely be set on December 3 or January 7.

- At the November 5, 2019 status conference, Ms. Wernes stated again that discovery was not yet complete. Ms. Benedict reported that she previously produced the requested documents to Mr. Shernaman, Ms. Wernes' prior counsel. Expressing frustration, the court told Ms. Wernes she would give her "one more shot" and set a final deadline for the filing of a motion to compel. The court stated it would rule on the motion at the next status conference set for December 3 and set a trial date, giving the parties trial dates of either January 28 or February 25, 2020 at 2:00 p.m., for a total of three hours. In the meantime, in lieu of answering the discovery, Ms. Benedict moved to strike Ms. Wernes' discovery requests and for discovery sanction against Ms. Wernes, which the court also set for December 3.

- At the status conference on December 3, 2019, the court heard and ruled on Ms. Wernes' motion to compel the production of documents and Ms. Kroesen's cross motions to strike and for sanctions. The court granted Ms. Wernes' motion to compel in part and directed Ms. Kroesen to answer certain portions of Ms. Wernes' discovery within seven days. The court denied Ms. Kroesen's motion for sanctions and motion to strike for the reasons stated on the record. Also, at this hearing, Ms. Wernes told the court that another recently-retained attorney would be representing her in both cases, but was unavailable to participate in the conference and had not yet entered an appearance. The court stated it was setting a final pretrial conference and trial date and that the matter would likely not be continued on account of a new attorney entering an appearance and advised her to let the attorney know.

- On January 28, 2020, the court held the final pretrial conference in both adversary proceedings. No attorney appeared or had filed a written entry of appearance so Ms. Wernes again proceeded pro se. The court confirmed its earlier oral ruling that both matters would be set at the same time for a total of three hours, each side to have 90 minutes, based on the parties' previous representations about how much time they needed and that Ms. Wernes would go first. The court reiterated that all evidence adduced would be submitted for purposes of both affirmative relief and defenses. The court also set a deadline for the filing of witness lists and electronic exhibits. Neither Ms. Wernes nor Ms. Benedict objected to the court's setting of the timed trial or requested more time to present their respective cases in chief or defense.

- Ms. Benedict timely filed her witness and exhibit lists. Ms. Wernes filed a motion to file her lists out of time. The court granted Ms. Wernes' motion and the resulting exhibit list consisted of 24 exhibits (143 pages) and some videos; the witness list listed nine witnesses, including Ms. Benedict and excluding Ms. Wernes.

- On February 25, 2020, the court conducted a trial in both adversary proceedings, starting at 2:00 p.m. and ending at 5:33 p.m. The court refused to allow Ms. Wernes to call Ms. Benedict. Ms. Wernes objected numerous times that the court had not given her sufficient time to present her case and the court gave her an extra 20 minutes before finally cutting her off. Given the lateness of the hour when Ms. Benedict finished her case, the court found the evidence had closed, adjourned the trial and allowed the parties another 45 minutes each (per Ms. Wernes' request) for closing arguments by phone the morning of March 3, 2020.

- On March 3, 2020, the parties presented their closing arguments. At the conclusion, the court ruled that judgment would be entered in favor of Ms. Wernes on Ms. Kroesen's stay violation complaint but reserved the right to make written findings of fact and conclusions of law and took the dischargeability complaint under advisement.

### *Jurisdiction*

At the threshold, the court finds it has jurisdiction over both matters under 28 U.S.C. § 1334 and 11 U.S.C. §§ 362 and 523. The court also has an independent duty to determine if the matters are core. 28 U.S.C. § 157(b)(3). As to Ms. Wernes' dischargeability complaint, Ms. Wernes alleged that matter was core and Ms. Kroesen admitted the allegation and dischargeability matters are specifically enumerated in the statute's list of core proceedings. The court concludes that the matter is undoubtedly core and no party disputed otherwise. 28 U.S.C. §§ 157(b)(1), (b)(2)(I).

With respect to the stay violation complaint, although she later orally conceded at the August 27, 2019 status conference that her complaint was core, Ms. Kroesen did not allege so in her complaint. Ms. Wernes likewise did not address it in her answer as required by Fed. R. Bankr. P. 7008, and further failed to comply with the court's deadline to consent or not.

Ms. Kroesen's complaint seeks damages and attorney fees pursuant to 11 U.S.C. § 362(k) and for injunctive relief in connection with the complaint's alleged violations. Proceedings involving violations of the automatic stay "arise under title 11" and are core pursuant to 28 U.S.C. § 157. *In re Calderon*, 497 B.R. 558, 564 (Bankr. E.D. Ark. 2013). Relating to Ms. Kroesen's request for injunctive relief, not only does 11 U.S.C. § 362(a) prohibit attempts to collect on a prepetition debt, but 11 U.S.C. § 105 grants this court the general authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *In re*

*Panther Mountain Land Dev., LLC*, 686 F.3d 916, 926 (8th Cir. 2012) (citing *In re Titan Energy, Inc.,* 837 F.2d 325, 328 n. 5 (8th Cir.1988) (quoting 11 U.S.C. § 105)). The Eighth Circuit recognizes that this court may issue stays or injunctions upon a showing of necessity. *Id.* The court therefore concludes that Ms. Kroesen's complaint asserts relief "arising under" the Code such that the matter is indeed a core proceeding. In the alternative, the parties clearly consented to the court's authority to hear and determine the matter by not objecting. The court therefore concludes that both matters are statutorily and constitutionally core under 28 U.S.C. §§ 157(b)(1) and (b)(2)(I). Turning now to the findings of fact and conclusions of law.

## JOINT FINDINGS OF FACT[5]

Except where noted, the following findings of fact are made with respect to both adversary proceedings. The court notes that Ms. Wernes failed to introduce many of her listed exhibits; where appropriate for context, the findings may refer to that exhibit as otherwise supported by other information in the record as a whole before the court, but the court does not consider any unadmitted exhibits to constitute evidence.

1.  Ms. Wernes was a friend and acquaintance of Ms. Kroesen's through various social circles.

2.  Ms. Kroesen in Jennifer Benedict's law firm [ECF No. 1; 18-42624].

3.  In 2016, Ms. Kroesen began her side business of "flipping" homes, called Sisters' Property, LLC. In essence, "flipping" involves acquiring a rundown home and rehabbing it, typically with funds lent by short-term lenders (a senior lender who lends the money for the purchase and a subordinate lender for the cost of rehab), and then selling the rehabbed home for a profit with repayment of principal plus interest to any investors within a relatively short

---

[5] All references to exhibits are in accord with the physical copies provided to the court. The court notes some discrepancy in the order of exhibits as between the ones filed online and the physical copies provided to the court.

period of time. The investor or investor's interest is often secured by the granting of a lien

or subordinate lien in the property acquired in favor of the investor or investors.

4.    Sometime in June 2016, Ms. Wernes agreed to be one of the subordinate investors in Ms.

Kroesen's flipping business.  On July 1, 2016, Ms. Kroesen recorded a subordinate deed

of trust, listing Ms. Wernes as the beneficiary on the "Main [Street] Property" (not at issue

here). [EXH 6; 19-04003].

5.    Ms. Kroesen testified that although the Main Property rehab project did not finish timely,

she paid the $5,000 in interest to Ms. Wernes when the note came due on December 16,

2016 and the parties renegotiated another promissory note. Ms. Kroesen ultimately repaid

Ms. Wernes the full amount of her investment with interest on the Main Property.

6.    Ms. Kroesen signed and notarized a subordinate deed of trust dated July 6, 2017, listing

Ms. Wernes as the beneficiary on the "River Property" (also not at issue here). [EXH 8;

19-04003].

7.    Ms. Wernes and Ms. Kroesen entered into a promissory note dated July 7, 2017 for the

purpose of buying, rehabbing, and selling the River Property. Per the note, Ms. Wernes

loaned Ms. Kroesen $25,000 and the terms required $1,000 per month on the unpaid

principal balance of the note until the full amount of the principal was paid. The note

required a balloon payment equal to the entire unpaid principal balance of note with all

accrued but unpaid interest on December 6, 2017. The maturity date on the note appears to

have been altered by hand to January 6, 2018 [EXH 7; 19-04003].

8.    On July 14, 2017, the subordinate deed of trust on the River Property was electronically

recorded. The deed of trust states that the maturity date was January 7, 2018.  [EXH 8; 19-

04003].

9.    At around the same time frame, Ms. Wernes and Ms. Kroesen discussed Ms. Wernes'

funding Ms. Kroesen's flipping of the Donovan Property, the property had issue here.

10.    Ms. Kroesen testified, prior to the Donovan Property project, she had completed three flips.

Ms. Kroesen added that she failed to timely complete all three flips as a result of poor time

management. Nonetheless, all those prior properties sold, and her investors made a profit.

11.    At the time Ms. Kroesen began rehabbing the Donovan Property, she had not yet finished

rehabbing the River Property.

12.    At some point (the date is not clear from the record, but prior to Ms. Wernes' loaning Ms.

Kroesen $90,000 for the Donovan Property rehab), Ms. Kroesen testified that she gave Ms.

Wernes the "Cost break down" of the project. Per the document's terms, the cost of the

house was $155,000 and the repair cost was $55,000; for a total cost of $210,000. The

breakdown stated that the hard money lender provided $110,000, or 65% of the ARV (after

repair value), and that Ms. Wernes was to provide $100,000. The breakdown also clarified

how Ms. Wernes would receive interest, with two options. Under option one, Ms. Wernes

would either receive $4,000 per month for six months ($24,000) or $16,000 if the home

sold in four months. Under option two, depending on the sales price, Ms. Wernes had the

option to take half of the profit, estimated at $20,000 to $30,000, with a predicted

completion of rehab in six weeks, or September 2 (presumably 2017). [EXH G; 19-04003].

13.    Ms. Wernes ultimately decided to lend Ms. Kroesen $90,000 for the Donovan Property

rehab project. Ms. Kroesen, through her LLC signed a promissory note dated July 14, 2017

for $90,000 payable at 48% interest. The principal and interest due were to be paid in six

months, or by January 14, 2017 [sic] in one installment of $111,600 or $90,000 plus half

of the profit, whichever was higher. [EXH 9; 19-04003]. Although this note was dated July

13

14 and Ms. Wernes lent the money to Ms. Kroesen in July, Ms. Kroesen's signature was not notarized until September 7, 2017. [The court will refer to this initial note as the July 14 Note.]

14.    The July 14 Note was to be secured by a subordinate deed of trust against the Donovan Property. Although Ms. Kroesen signed and notarized a subordinate deed of trust in favor of Ms. Wernes for the Donovan Property, she did not record it; a different deed of trust was recorded later, as will be discussed below. [EXH 10; 19-04003].

15.    Ms. Wernes alleges that Ms. Kroesen's failure to record the deed of trust initially was intentional and deliberate. Ms. Kroesen testified the failure was an oversight. Since Ms. Kroesen is a paralegal and had prepared and recorded loan documents in connection with the earlier two flips Ms. Wernes had invested in, the court believes these failures were intentional. The court also notes that attorney Jennifer Benedict is listed as trustee on the Donovan Property deed of trust, as well as on the deeds of trust for the Main and River Properties.

16.    At the time Ms. Kroesen borrowed the $90,000 from Ms. Wernes for the purpose of rehabbing the Donovan Property, unbeknownst to Ms. Wernes, Ms. Kroesen had not yet actually acquired the Donovan Property. In fact, it wasn't until a week after the loan documents with Ms. Wernes were signed, or on July 21, 2017, that Ms. Kroesen's LLC borrowed $143,000 from Crossroads Management Group, LLC for the purpose of acquiring the Donovan Property. Ms. Kroesen also signed a personal guaranty in favor of Crossroads for $143,000 and granted Crossroads a first lien in the Donovan Property, which was duly recorded, as discussed below [Claim 9-1 Part 4; ECF No. 18-42624].

17.     The July 21, 2017 settlement statement for the Donovan Property acquisition reflects that

Ms. Kroesen started with $219,400 invested in the property. She purchased the property

for $150,000, paid by the $143,000 loan from Crossroads plus a deposit of $75,000 to cover

the remaining sales price and settlement charges, leaving a $55,000 fund for future draws

for the rehabilitation costs themselves [EXH 11-B; 19-04003]. Presumably, Ms. Wernes'

$90,000 was the source of the deposit. But it is unclear from the record how this project

ever would have been financially solvent unless it had completed timely.

18.     On July 24, 2017, a first deed of trust on the Donovan Property was recorded in favor of

Crossroads Management Group, LLC. This document was signed by Ms. Kroesen on July

21, 2017 and her signature was notarized July 21, 2017. A representative for Crossroads

signed July 20, 2017 and his signature was notarized July 20, 2017 [Claim 9-1 Part 5; ECF

No. 18-42624].

19.     It is unclear when Ms. Kroesen actually began work on the Donovan Property. Ms. Kroesen

testified that she only used the Donovan Property draw funds for work on the Donovan

Property. The court does not find that testimony credible, however, since Ms. Kroesen was

unable to produce receipts or invoices or lien waivers documenting that.

20.     The first evidence that Ms. Kroesen had undertaken some rehab work on the Donovan

Property is an invoice dated September 11, 2017, for work performed on the Donovan

Property's foundation in the amount of $12,825 [ECF No. 58, EXH. R; 19-04003].

21.     Although the invoice reflects that Ms. Kroesen paid $6,412.50 of the foundation bill, how

much she paid for foundation work and how work was actually done is not clear, however,

since almost three weeks later, on September 29, 2017, Ms. Kroesen drew $15,000 out of

the Donovan Property draw funds allegedly for foundation work [EXH 12; 19-04003],[6] but she testified she actually spent $20,000 total. There are no corresponding receipts, however, and there were allegedly later problems with the foundation, as will be discussed below.

22.     On October 2, 2017, Ms. Wernes texted Ms. Kroesen to ask whether the rehab was still on target to complete and the Donovan Property ready to sell by "the 15th" (presumably, January 15, 2018), and Ms. Kroesen replied that it was.  [EXH 17; 19-04003].

23.     On October 15, 2017, Ms. Wernes again texted Ms. Kroesen to ask how the "[project] was coming" and Ms. Kroesen replied, "too slow." Ms. Kroesen texted that the foundation and heating, cooling and electrical work were complete, and that the ceilings and walls would be finished later that week, with the kitchen and bathrooms to be done the following week. [EXH 17; 19-04003]. At the time Ms. Kroesen texted this to Ms. Wernes, it was not accurate, although no evidence was presented about Ms. Kroesen's intent with this statement or Ms. Wernes' reliance on this and other statements during this time period, as will be discussed below.

24.     On October 30, 2017, Ms. Wernes texted Ms. Kroesen to ask what the new goal was to have the home on the market and Ms. Kroesen responded, "I'm going to say Dec. 1 at the latest, but I'm busting my butt." [EXH 17; 19-04003]. That likewise was not accurate since the Donovan Property was not in condition to be placed on the market as a renovated home.

---

[6] Exhibit 12 is a document referred to, at trial, as "SOW" (Scope of Work) and reflects Ms. Kroesen's draws from Crossroads. Both parties provided SOW in their lists of exhibits, but only Ms. Wernes' SOW was admitted into evidence. The court notes however, significant discrepancies between the two SOW documents including that the debtor's SOW exhibit reflects two large draws before the purchase of Donovan including $15,000 for the foundation and $8,000 for the HVAC and "miscellaneous."

After requesting a copy of the note, Ms. Wernes texted back, "Do you want to re-borrow the money again in January?" Ms. Kroesen did not respond. [EXH 17; 19-04003]

25.    The next day, Ms. Wernes texted again, "Do you want to re-borrow the money again in January?" followed by "I don't think the house will sell and close by the time the note is up." She received no response. Later that afternoon of October 31, Ms. Wernes texted Ms. Kroesen again to ask for the third time, "Do you want to re-borrow the money again in January?" Ms. Kroesen's response (the time unclear), was "As much as I don't want to, I don't . . ." The rest of the reply appears to be cut off. The next page of the exhibit resume at at unknown date with Ms. Wernes' text to Ms. Kroesen, "So I assume you want to borrow the ~$20k interest in addition to re-borrowing the $90K for another three months?" followed by "So on January 14, a new note for $111, 600? Same interest?" Ms. Wernes texted, "Yes." [EXH 17; 19-04003].

26.    A few hours later on this unknown date, Ms. Wernes texted, "What does the house have to sell for by April 14 to cover the revised note?" to which Ms. Kroesen responded, "At least $230,000." Ms. Wernes replied, "If [sic] that possible? Is the house upside down?" adding in the next text, "The last 6 months, you paid 4% per month or $3600 on $90K. On $111,600 at 4% per month is $4464 per month. So for another three months, that's $13,392 in interest. So note balloons on April 14 at $124,992." The exhibit contains no response. The court notes that that between the $143,000 owed to Crossroads and another almost $125,000 to Ms. Wernes, the Donovan Property was upside down.  [EXH 17; 19-04003].

27.    In the meantime, according to Ms. Kroesen's testimony, the River Property rehab had finished in November 2017. The court does not believe the River Property was complete in November 2017 since, as will be discussed below, Ms. Kroesen made representations to

17

Ms. Wernes about getting paid for her investment in the River Property in January 2018. The court believes it is likely Ms. Kroesen did little or no work on the Donovan Property until the River Property was finished because the court does not find Ms. Kroesen's testimony about her efforts to rehab the Donovan Property credible.

28.    On January 17, 2018, several days after the July 14 Note had come due, Ms. Kroesen emailed Ms. Wernes regarding the Donovan Property. Ms. Kroesen acknowledged that the project was taking longer than promised, but that she trusted her numbers and stated that Ms. Wernes would receive all her money back when both the River Property and Donovan Property sold. Complaining that Ms. Wernes was micro-managing her and overstepping boundaries on checking on the progress, Ms. Kroesen added that she would update Ms. Wernes once a week, with pictures, via email. There is no evidence in the record to show whether she did so [ECF No. 58, EXH E; 19-04003].

29.    As stated, the July 14 Note ballooned January 14, 2018. Ms. Wernes filed, but did not offer into evidence at trial, a series of promissory notes showing that, after the July 14 Note came due, she and Ms. Kroesen extended the loan several times into new notes, each of which added the accrued interest to the principal, and that each subsequent note continued to accrue interest at 48%. Because these intervening notes were not offered into evidence, the court does not consider them in this opinion but mentions them for context.

30.    The court finds that the Wernes-Kroesen lending relationship culminated in a final promissory note, dated June 20, 2018 and notarized June 27, 2018. Although this note was not offered into evidence at trial, it was attached to Ms. Wernes' proof of claim, and, as mentioned above in the procedural history, Ms. Kroesen withdrew her objection to the proof of claim. In addition, a Second Deed of Trust (inexplicably dated July 27, 2018, and

notarized June 27, 2018) was recorded on June 29, 2018. This deed of trust was both admitted into evidence at trial (EXH 23) and was also attached to the allowed proof of claim of the court takes judicial notice. 11 U.S.C. § 502(a).

31.  By April 14, 2018, the date the January note would have come due based on Ms. Wernes' October 31 texts, the Donovan Property was still not finished. One of the trial witnesses, Eileen Mitricska, an acquaintance from Ms. Kroesen's weekly poker group, credibly testified that Ms. Kroesen in essence put out a call for volunteers to help paint the interior of the Donovan Property and that on April 22, 2018, she had volunteered. Ms. Mitricska testified that she was not a professional painter, but that Ms. Kroesen was simply looking for help to paint the home.

32.  By now clearly frustrated with the delay, Ms. Wernes in late April 2018 recorded a video of the Donovan Property she titled "Debbie Kroesen-One week away." The video reflects that the rehab was not finished and that (a) the home required interior paint work; (b) the ceilings were not finished; (c) the kitchen was incomplete; (d) there were materials scattered in the yard; and (e) a step outside the home required construction [EXH 25; 19-04003].

33.  On or around June 20, 2018, Ms. Kroesen executed the final note for the Donovan Property dated June 20, 2018 now in the principal amount of $134,191.34 with interest accruing at 48% (or monthly payments of $4,828.26 from June 14, 2018 payable by August 14, 2018).

34.  On June 28, 2018, Ms. Kroesen took a final draw for $3,000 for "exterior paint." As of June 28, 2018, Ms. Kroesen had drawn $50,000 out of an available $55,000 [ECF No. 61, EXH 12; 19-04003].

35.    On June 29, 2018, more than a year after Ms. Wernes originally lent the $90,000 to be secured by a subordinate deed of trust, Ms. Kroesen finally recorded a subordinate deed of trust in Ms. Wernes' favor and listed the principal sum as $90,000 [EXH 23; 19-04003]. It is unclear why the recorded deed of trust was only for $90,000 when the principal and interest advanced at that point were more than $135,000 and the deed of trust, particularly because the deed of trust did not contain a future advance clause. Since Ms. Kroesen drafted the deed of trust, the court believes the failure to fully protect Ms. Wernes' investment was intentional.

36.    At this point, Ms. Wernes was again becoming increasingly frustrated. Ms. Kroesen attempted to convince the court that she was still in good faith working on completing the Donovan Property during this time frame, but admitted in cross-examination that she had stopped paying interest payments to Crossroads and did not keep receipts of all the work she said she had completed.

37.    On July 24, 2018, Ms. Wernes recorded a video of the Donovan Property she titled "Debbie Kroesen- 'Got a guy going finish it in two weeks.'" The video reflects that the rehab required more work including (a) interior paint; (b) door attachment; (c) kitchen backsplash installation; and (d) kitchen cabinet installation. The video does reflect however, that the floors were finished, one bathroom was finished, and that much of the home's trim was painted, but was not yet installed [EXH 25; 19-04003].

38.    On August 14, 2018, the June 20, 2018 promissory note came due and was not paid.

39.    On October 4, 2018, Ms. Kroesen filed a chapter 13 petition and notice was served on Ms. Kroesen's creditors, including Ms. Wernes [ECF Nos. 1, 5; 18-42624].

40.     On October 4, 2018, Schedule D of Ms. Kroesen's bankruptcy schedules lists Crossroads

Investment Lending with a claim of $130,000 secured by the Donovan Property. She

valued the property at $150,000 and the nature of the lien was listed as an agreement and

a statutory lien [ECF No. 1; 18-42624].

41.     The Schedule D also lists Ms. Wernes as a secured creditor with a claim of $90,000 on the

Donovan Property. The nature of the lien was listed as an agreement [ECF No. 1; 18-

42624].

42.     On December 20, 2018, Crossroads Management Group, LLC filed a proof of claim in Ms.

Kroesen's bankruptcy case. Per the proof of claim, (a) Crossroads held a secured claim of

$154,606.40; (b) the basis of the claim was a personal guaranty on a mortgage/deed of trust

for the Donovan Property; and (c) the principal balance was $143,000 [Claim 9-1; 18-

42624].

43.     On January 2, 2019, Ms. Wernes filed a proof of claim in Ms. Kroesen's bankruptcy case,

stating (a) she held a secured claim of $150, 522 for money loaned; (b) that the claim was

secured by a lien on the Donovan Property; (c) that the value of the property was $200,000;

and (d) that part of the claim was subject to priority [Claim 10-1; 18-42624]. As discussed

above in the procedural history, the trustee's objection to the claim was sustained after Ms.

Wernes did not respond.

44.     On January 5, 2019, Ms. Wernes timely filed adversary proceeding No. 19-04003, asserting

fraud in relation to the June 20, 2018 promissory note, the terms of which were that Ms.

Kroesen was to repay Ms. Wernes $135,191.34, plus interest at $4,828.26 per month

beginning June 14, 2018 [ECF No. 1; 19-04003].

45.     On February 5, 2019, Ms. Kroesen filed an amended chapter 13 plan. The plan was filed as a "below median," zero percent plan, and consented to the surrender of the Donovan Property to Crossroads Investment Lending and to Ms. Wernes [ECF No. 52; 18-42624].

46.     On February 8, 2019, Crossroads Management Group, LLC filed a motion for relief from the stay regarding the Donovan Property [ECF No. 56; 18-42624].

47.     On February 25, 2019, the court granted the chapter 13 trustee's objection to Ms. Wernes' proof of claim [ECF No. 62; 18-42624].

48.     On February 26, 2019, the court granted Crossroad's motion for relief from the automatic stay regarding the Donovan Property [ECF No. 65; 18-42624].

49.     On March 5, 2019, Ms. Kroesen's chapter 13 plan was confirmed [ECF No. 72; 18-42624] as a 0% payment plan.

50.     On March 14, 2019, Ms. Kroesen withdrew her objection to Ms. Wernes' proof of claim [ECF No. 74; 18-42624].

51.     On March 21, 2019, Ms. Wernes posted a video of the Donovan Property titled "Debbie Kroesen-'Just trim left'" on YouTube. With the video, a caption expressed: "After nearly six months of rehabbing this house, Debbie Kroesen said she was two weeks out from putting it on the market and that she just had trim left." There is no caption as to the date when this video was recorded [ECF No. 58, EXH W, 19-04003]. The video reflects that the Donovan Property was in disrepair and required additional improvements such as (a) flooring finishes; (b) interior paint work; (c) bathroom construction; (d) door attachment; and (e) insulation cover [ECF No. 61, EXH 25, 19-04003];

52.     On April 1, 2019, Ms. Wernes posted the video of the Donovan Property titled "Debbie Kroesen-One week away" on YouTube. The caption to the video reads: "Debbie Kroesen

started rehabbing this house in late July of 2017. She said it would be on the market by October 1, 2017. This video was taken on April 27, 2018 when Debbie said she was one week away from having it on the market." [ECF No. 58, EXH W, 19-04003].

53. On April 1, 2019 Ms. Wernes posted another YouTube video of the Donovan Property titled "Debbie Kroesen- 'Got a guy going finish it in two weeks.'" The caption to the video reads: "Debbie Kroesen signed a promissory note that she would have this house rehabbed and sold by August 18, 2018 (this was the final of several notes that she defaulted on). This video was taken July 24, 2018 after she was given a $10K incentive to complete the project by July 23. . . ." [ECF No. 58, EXH W, 19-04003].

54. On April 5, 2019, according to Ms. Kroesen, she performed at the Kansas City Women's Chorus and Ms. Wernes attended the event.

55. Sometime that same weekend, between April 5 and 7, 2019, Ms. Wernes created a Facebook page entitled "Debbie Kroesen Victims and their Supporters." The page expressed that the purpose of the post was to "raise awareness in Kansas City to Debbie Kroesen's activities that have led to a fraud investigation." The page requests that any "victims" of Debbie Kroesen's activities should message her. Included on the page, is the YouTube video "Debbie Kroesen 'Just trim left'" [ECF No. 58, EXH. S; 19-04003].

56. On April 9, 2019, Ms. Kroesen filed her adversary complaint against Ms. Wernes for alleged violations of the automatic stay. The complaint sought damages, injunctive relief, and attorney fees for Ms. Wernes' alleged actions at the Kansas City Women's Chorus, her Facebook posts, and an alleged act of vandalism to her car on the weekend of April 5-7 [ECF No. 1; 19-04002].

Additional findings of fact will be noted in connection with conclusions of law, below.

**CONCLUSIONS OF LAW**

**I.**

**Debtor Deborah Kroesen's Complaint for Damages and Injunctive Relief [ECF No. 1; 19-04022]**

Ms. Kroesen's complaint includes three counts: Count I: Violation of the Automatic Stay; Count II: Injunctive Relief and/or a Temporary Restraining Order; and Count III: Attorney Fees. During trial, counsel for Ms. Kroesen confirmed that she did not wish to pursue Count II. After closing arguments, the court announced that it did not find that Ms. Wernes violated the automatic stay and reserved the right to issue these findings of fact and conclusions of law. As such, the court makes the following findings of fact and conclusions of law as to the alleged stay violations and whether attorney fees are warranted.

Count I of Ms. Kroesen's complaint alleges Ms. Wernes violated the automatic stay when, post-petition, Ms. Wernes (a) created the Facebook page titled "Debbie Kroesen and their Supporters"; (b) attended the Kansas City Women's Chorus where Ms. Kroesen performed and allegedly followed, harassed, and physically intimidated Ms. Kroesen; and (c) allegedly vandalized Ms. Kroesen's car. Count III seeks attorney fees for litigating this action.[7]

The automatic stay prohibits "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(6). "[T]he filing of a bankruptcy petition automatically halts efforts to collect prepetition debts from the bankrupt debtor outside the bankruptcy forum." *Ritzen Grp., Inc. v. Jackson Masonry*, *LLC*, No. 18-938, 2020 WL 201023, at *4 (U.S. Jan. 14, 2020) (citing 11 U.S.C. § 362(a)). "The stay

---

[7] While plaintiff's counsel cites to Fed. R. Bankr. P. 7008 for the procedural requirement of pleading attorney fees as a separate claim, the rules were amended in 2014 such that Fed. R. Bankr. P. 7054(b)(2) now governs. The amended rule no longer requires attorney fees be plead as a separate claim.

serves to 'maintai[n] the status quo and preven[t] dismemberment of the estate' during the pendency of the bankruptcy case." *Id.* (citing 1 Collier ¶1.05[1], p. 1–19; 3 *id.*, ¶362.03, p. 362–23). "[T]he automatic stay is fundamental to the reorganization process, and its scope is intended to be broad." *In re Knaus*, 889 F.2d 773, 774 (8th Cir. 1989) (citations omitted).

Any willful violation of the stay entitles an injured individual to recover "actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k). "Section 362[(k)] provides for recovery of damages including attorney's fees, not damages and attorney's fees." *In re Siharath*, 285 B.R. 299, 306 (Bankr. D. Minn. 2002). "If the elements of a willful violation are met, 'the court must award compensatory damages then decide whether punitive damages are appropriate.'" *In re Anderson*, 430 B.R. 882, 888 (Bankr. S.D. Iowa 2010) (citation omitted). Not only may damages be awarded pursuant to § 362(k), but also this court's equitable powers further empower courts to remedy stay violations. *In re Jim Nolker Chevrolet-Buick-Oldsmobile, Inc.*, 121 B.R. 20, 22 (Bankr. W.D. Mo. 1990) (citing 11 U.S.C. § 105) (footnote omitted).

The debtor bears the burden of proof in an action for violation of the automatic stay. *In re Westman*, 300 B.R. 338, 342 (Bankr. D. Minn. 2003). The standard is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286 (1991). The defendant bears the burden to prove any defenses raised. *Westman*, 300 B.R. at 342.

### 11 U.S.C. § 362

"To prevail under § 362(k), the debtor must show: (1) the creditor violated the automatic stay; (2) the violation was willful; and (3) the debtor was injured by the violation." *In re Marino*, 437 B.R. 676, 678 (B.A.P. 8th Cir. 2010) (citing *Lovett v. Honeywell, Inc.,* 930 F.2d 625, 628 (8th Cir.1991)).

**1st Element: *Whether a violation occurred***

The first requirement is that the creditor violated the stay. Any act to collect on a debt against the debtor that arose prepetition violates the automatic stay. 11 U.S.C. § 362(a)(6). While the stay "does not prohibit all communications from a creditor to a debtor, a stay violation is made out by actions that are coercive or harassing in nature." *Weary v. Poteat*, 627 F. App'x 475, 477 (6th Cir. 2015) (citations omitted). A creditor with knowledge of the bankruptcy stay violates the stay when his actions could serve no other purpose "other than to threaten, harass and intimidate the Debtor in an effort to coerce [payment]. . . ." *Weary*, 627 F. App'x at 477.

"[W]hile § 362 is broad, it 'is sufficiently tailored to leave unfettered speech which will not affect the twin purposes behind the automatic stay. . . .'" being, "to protect debtors from 'all collection efforts, all harassment, and all foreclosure actions,' and to protect creditors by preventing some creditors from obtaining 'payment of the claims in preference to and to the detriment of other creditors. . . .'" *In re Crudup*, 287 B.R. 358, 362 (Bankr. E.D.N.C. 2002) (quoting *In re Sechuan City, Inc.,* 96 B.R. 37, 40-42 (Bankr.E.D.Pa.1989) (citing H.R.Rep. No., 95–595, 95th Cong. 1st Sess. 340 (1977), U.S. Cong. & Admin. News 1978, p. 5787)).

Where speech and non-speech elements are involved, the constitutionality of an injunction is evaluated under the test outlined in *United States v. O'Brien,* 391 U.S. 367, 376-77 (1968):

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Crudup*, 287 B.R. at 362 (citing *O'Brien,* 391 U.S. at 377). Restraint on "pure speech" however, mandates the closest scrutiny. *Matter of Nat'l Serv. Corp.*, 742 F.2d 859, 862 (5th Cir. 1984) (citing *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); *Police Department of the*

*City of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Carroll v. President and Commissioners of Princess Ann,* 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968)).

Speech that is not commercial and does not solicit purchase of a product or service, advertise, or result in being remunerated but rather, resembles a public service message, may be deemed "pure speech." *Matter of Nat'l Serv. Corp.*, 742 F.2d at 862.

While "the scope of the automatic stay may at times incidentally impact free speech, [] those isolated intrusions are justified in order to accomplish the significant governmental interest in providing uniform bankruptcy laws and an effective means by which to implement them." *In re Collier*, 410 B.R. 464, 474 (Bankr. E.D. Tex. 2009) (citation to footnote omitted).

### 2nd Element: Whether there was a willful violation

The second element is a willful violation. "A violation is willful 'when the creditor acts deliberately with knowledge of the bankruptcy petition.'" *Marino*, 437 B.R. at 678 (quoting *Knaus,* 889 F.2d at 775). "An 'innocent' stay violation can become willful if the creditor 'fails to remedy the violation after receiving notice of the stay.'" *In re Preston*, 395 B.R. 658, 665 (Bankr. W.D. Mo. 2008) (citations omitted).

"Although § [362(k)] requires a 'willful' violation as a condition precedent to recovering damages, this does not mean that an entity must intend to violate the stay." *In re Westman*, 300 B.R. 338, 342 (Bankr. D. Minn. 2003). "[R]ather it requires that the acts which violate the stay be intentional." *Id.* (citing *Lansdale Family Restaurants Inc. v. Weis Food Service* (*Lansdale Family Restaurants Inc.*), 977 F.2d 826, 829 (3rd Cir.1992); *Knaus,* 889 F.2d at 776.

### 3rd Element: Whether there was an injury

The third requirement is injury to the debtor. "'[I]njury' is broadly defined as being 'a violation of another's legal right, for which the law provides a remedy.'" *In re Jackson*, 309 B.R.

33, 37 (Bankr. W.D. Mo. 2004) (citing *Black's Law Dictionary* 789 (7th ed.1999)). Because the automatic stay is a legal right which protects debtors from creditor collection efforts, violating the stay "constitutes an injury to the debtor inasmuch as the creditor's violation restricts the debtor's breathing spell and subjects the debtor to continued collection efforts, possibly including harassment and intimidation." *Id.*

### Conclusion: Ms. Wernes did not violate the automatic stay

Based on the evidence presented in this case, the court finds and concludes that Ms. Kroesen did not meet her burden of proof to show that any of the actions taken or alleged to have been taken by Ms. Wernes were attempts to collect a debt and thus a violation of the stay.

First, Ms. Kroesen presented no evidence to show that Ms. Wernes vandalized Ms. Kroesen's car. Ms. Kroesen did not produce a police report or even any evidence such as photographic evidence that her car had been vandalized, let alone that the vandalization was committed by Ms. Wernes. She testified, not credibly, that she did not have any receipts for repairs for the alleged vandalization because she had had the car fixed at a friend's shop and that the friend did not charge her for the repairs.  Without evidence that Ms. Wernes damaged the car, the court finds there can be no stay violation for the alleged vandalization.

Second, relating to the Facebook page entitled "Debbie Kroesen Victims and their Supporters," the court holds that this post did not violate the automatic stay. The court finds, based on Ms. Wernes' admission, that she created and posted the Facebook page. While the posting may indeed have embarrassed Ms. Kroesen, there was no solicitation of funds or demand for repayment. The post merely states its purpose of "raising awareness" and finding other "victims." Ms. Kroesen testified that she felt intimidated by the post but admitted that nothing in the post demanded money or repayment.

28

Ms. Kroesen's feelings of intimidation or embarrassment, without more, do not justify a finding that Ms. Wernes violated the automatic stay. In parallel, while not pled in the complaint, the court makes similar findings as to the YouTube posts. The posts neither solicited funds, nor bullied Ms. Kroesen into payment. The court finds the purpose of the videos was to show the status of the rehab at certain dates, not to harasses or intimidate Ms. Kroesen to repay a debt. Ms. Wernes stated she later took them down. Both the Facebook page and the YouTube videos are examples of free speech protected by the First amendment and do not constitute violation of the automatic stay.

Lastly, regarding the alleged incident at the Kansas City Women's Chorus on April 5, 2020, Ms. Kroesen, a singer in the chorus, contends in her complaint that, during breaks and after the performance, Ms. Wernes allegedly harassed Ms. Kroesen and followed her around the venue with the intent to bully and intimidate. Ms. Kroesen argues that Ms. Wernes intended to "defame, embarrass, harass, physically intimidate, and bully" her concerning the debt owed.

At trial, the court heard conflicting testimony from witnesses as to what occurred on April 5. Ms. Kroesen testified that Ms. Wernes followed her around while she mingled with the public after the show. Ms. Kroesen said that when she stopped to speak to someone, Ms. Wernes would lean over the person and stare menacingly at her. And while Ms. Kroesen testified that Ms. Wernes said nothing to her, she felt intimidated and chose to wait in the back of the venue until her ride came to pick her up.

A witness for Ms. Kroesen, Judy Siegfried, credibly testified that, after the chorus performance, in the crowded lobby, she was talking to Ms. Kroesen and saw Ms. Wernes walk towards them. Ms. Siegfried stated that Ms. Wernes stood within inches of Ms. Kroesen's face in

a bullying manner but said nothing. Ms. Siegfried then testified that when Ms. Kroesen tried to walk away, Ms. Wernes followed her and was very intimidating.

Nancy Kelso, a witness for Ms. Wernes, had an entirely different recollection. Ms. Kelso credibly testified that, after the performance, she walked with Ms. Wernes into the lobby and when Ms. Kroesen saw Ms. Wernes, it was Ms. Kroesen who became visibly angry. Ms. Kelso testified that Ms. Kroesen pointed at Ms. Wernes and exclaimed that what she posted on Facebook was slanderous and threatened to call the police. Ms. Kelso stated that Ms. Wernes was at least five feet away from Ms. Kroesen and that Ms. Wernes did not follow Ms. Kroesen around the venue.

The court believes that both Ms. Siegfried and Ms. Kelso were sincere in recounting what they believed they saw – one believing there was a confrontation initiated by Ms. Wernes and the other just the opposite. Although the evidence is undisputed that Ms. Wernes and Ms. Kroesen were in the same lobby together at the same time, and that there was some type of uncomfortable interaction, the court cannot conclude based on the seemingly sincere testimony of conflicting witnesses what really happened, except for this: the one aspect of the story all the witnesses agreed upon was that Ms. Wernes never said anything to Ms. Kroesen. While silent bullying and menacing could conceivably cross a line such as to constitute a stay violation, the evidence here is simply not sufficient to show by a preponderance of the evidence that Ms. Wernes crossed that line. Ms. Kroesen had the burden of proof in showing a stay violation occurred and she failed to carry that burden.

Even if Ms. Wernes' interaction with Ms. Kroesen at the Women's Chorus event constituted a stay violation, the court would also find that the violation was not willful; Ms. Wernes credibly testified her decision to attend the performance was a last-minute decision based on an invitation by another friend, not because she thought Ms. Kroesen would be there and that she

would go to intimidate her into paying the debt. Yes, Ms. Wernes was undoubtedly upset at her former friend at losing her entire investment after having been strung along for more than two years. And, yes, Ms. Kroesen was undoubtedly upset and hurt about the negative Facebook pages posted by her former friend. But in the end she failed to even prove that she was damaged, assuming any stay violation occurred.

Based on the foregoing findings and conclusions, the court finds that judgment will enter in favor of Ms. Wernes and against Ms. Kroesen on all Counts of her complaint in Adversary No. 19-4022.

## II.

### Nance Wernes' Complaint to Determine Dischargeability [ECF No. 1; 19-04003]

Ms. Wernes asserts that the extension of credit she granted Ms. Kroesen pursuant to the June 20, 2018 promissory note was incurred by false pretenses, and misrepresentations and should be deemed nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A)-(B).

The discharge is a key component of a bankruptcy debtor's fresh start. For this reason, discharge denial should be a "harsh and drastic penalty," and all nondischargeability provisions under section 523 are construed in favor of debtors. *In re Foster*, 335 B.R. 709, 714 (Bankr. W.D. Mo. 2006); s*ee also In re Sendecky*, 283 B.R. 760, 763 (B.A.P. 8th Cir. 2002). The party arguing nondischargeability bears the burden to show every element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286-91 (1991). In other words, the judge "must believe the existence of a fact is more probable than its nonexistence." *In re Schnuelle*, 441 B.R. 616, 621 (B.A.P. 8th Cir. 2011) (further citation omitted).

### Count I: 11 U.S.C. § 523[a](2)(A)

Section 523(a)(2)(A) of the bankruptcy code excepts from discharge a debt "for money…or an extension, renewal, or refinancing of credit to the extent obtained by . . . false pretenses, a false representation, or actual fraud. . . ." 11 U.S.C. § 523(a)(2)(A). "False pretenses, false representations, and actual fraud are three separate elements." *In re Holmes*, 570 B.R. 610, 617 (Bankr. W.D. Mo. 2017) (citation omitted). Ms. Wernes alleges that Ms. Kroesen made false pretenses and false representations in connection with the June 20, 2018 promissory note.

By definition, "[a]ctual fraud…consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." *In re Moen*, 238 B.R. 785, 790 (B.A.P. 8th Cir. 1999) (citations omitted). "Actual fraud…encompass[es] anything that counts as fraud and is done with wrongful intent. . . ." *Holmes*, 570 B.R. at 617 (citation omitted).

> "'Actual fraud' has two parts: actual and fraud. The word 'actual' has a simple meaning in the context of common-law fraud: It denotes any fraud that 'involv[es] moral turpitude or intentional wrong.' 'Actual' fraud stands in contrast to 'implied' fraud or fraud 'in law,' which describe acts of deception that 'may exist without the imputation of bad faith or immorality.' Thus, anything that counts as 'fraud' and is done with wrongful intent is 'actual fraud.'"

*Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016) (quoting *Neal v. Clark,* 95 U.S. 704, 709, 24 L.Ed. 586 (1878)).

A false pretense "involves implied misrepresentation or conduct intended to create and foster a false impression." *Moen*, 238 B.R. at 791. "[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct

what would otherwise be a false impression. This is the basis of the 'false pretenses' provision of Section 523(a)(2)(A)." *Id.* (citations omitted).

As for false representation, "[a] misrepresentation or false representation under § 523(a)(2)(A) must relate to a past or present fact." *In re Sulier*, 541 B.R. 867, 878 (Bankr. D. Minn. 2015) (citation omitted). While "the failure to perform a mere promise is not sufficient to make a debt nondischargeable. . . .[a] misrepresentation by a debtor of his or her intention to perform contractual duties…may be a false representation. . . ." 4 Collier on Bankruptcy P 523.08 (16th 2019) (citing *FCC Nat'l Bank/First Card v. Friend* (*In re* Friend), 156 B.R. 257 (Bankr. W.D. Mo. 1993); *In re Maurer*, 112 B.R. 710, 713 (Bankr. E.D. Pa. 1990)).

"Section 523(a)(2) applies not only to a debtor who obtains money, property or services by his deception. It also applies to a debtor who obtains an 'extension, renewal or refinancing of credit.'" *In re Brzakala*, 305 B.R. 705, 711 (Bankr. N.D. Ill. 2004) (quoting 11 U.S.C. § 523(a)(2)).

"[C]ourts have stated that '[a]n extension, within the meaning of § 523(a)(2), is an indulgence by a creditor giving his debtor further time to pay an existing debt.'" *Matter of Selenberg*, 856 F.3d 393, 397 (5th Cir. 2017) (citing *In re Gerlach*, 897 F.2d 1048, 1050 (10th Cir. 1990) (quoting *Takeuchi Mfg. (U.S.), Ltd. v. Fields* (*In re Fields*), 44 B.R. 322, 329 (Bankr. S.D. Fla. 1984)); *accord In re Rollins*, No. 06-10549, 2007 WL 2319778, at *6 (Bankr. E.D. La. Aug. 10, 2007). Put another way, "the Bankruptcy Code 'protects the creditor who is deceived into forbearing collection efforts.'" *Id.* (citing *In re Marx*, 138 B.R. 633, 636 (Bankr. M.D. Fla. 1992); *accord Gerlach*, 897 F.2d at 1050; *Rollins*, 2007 WL 2319778, at *6).

To make a showing for nondischargeability under § 523(a)(2)(A), a creditor must plead and prove the following five elements:

(1) the debtor made a representation,

(2) with knowledge of its falsity,

(3) deliberately for the purpose of deceiving the creditor,

(4) who justifiably relied on the representation,

(5) which proximately caused the creditor damage.

*In re Hernandez*, 860 F.3d 591, 602 (8th Cir. 2017).

### 1st Element: Whether the debtor made a representation

The first requirement is that the debtor made a representation. Silence regarding a material fact may suffice for a representation. *Moen,* 238 B.R. at 791. "Representation" is not confined to spoken or written words, but also encompasses other conduct that amounts to an assertion inconsistent with the truth. *Id.* (citation omitted). While the debtor need not "bare [her] soul" to the creditor, the creditor has a right to know the facts essential to the transaction. *Id.*

### 2nd Element: Whether the debtor knew the representation was false

As to the second requirement, that the debtor knew the representation was false when she made it, is sufficient if the declarant made the statement not knowing of its falsity but with a reckless disregard for the truth of the statement. *Id.* In determining whether the declarant knew the representation was false when it was made, the court may consider the knowledge and experience of the declarant. *Id.*

### 3rd Element: Whether the debtor had the intent to deceive

The third requirement is intent to deceive. The court need not find the debtor acted with malevolence or ill-will to find intent to induce a creditor to rely and act on a misrepresentation. *Id.* (citation omitted). Because direct evidence of intent is rare, a court may accept surrounding circumstances that create an inference of an intent to deceive the creditor. *Schnuelle*, 441 B.R. at 622. When the creditor introduces this circumstantial evidence of intent, the declarant's self-serving statement of honest intent is not enough to overcome the inference of intent. *Id*. The focus

is on "whether the debtor's actions appear so inconsistent with [her] self-serving statement of intent that the proof leads the court to disbelieve the debtor." *Id*. (citations omitted). A debtor who fraudulently obtains credit is not absolved merely because she intends to repay the debt. *Hernandez*, 860 F.3d at 603.

### 4th *Element: Whether the creditor justifiably relied on the misrepresentation*

The fourth requirement is justifiable reliance. In *Field v. Mans*, 516 US 59, 73-74, the Supreme Court held that subsection (a)(2)(A) requires justifiable reliance, but not necessarily reasonable reliance, under subsection (a)(2)(B). It noted that reasonable reliance is a more stringent standard than justifiable reliance. *Id*. at 77. Justifiable reliance is a subjective standard. *In re Schmank*, 535 B.R. 243, 258 (Bankr. E.D. Tenn. 2015) (citation omitted). Justifiable reliance falls somewhere between actual reliance and reasonable reliance – even if an investigation would have revealed the falsity of the representation, reliance can still be justifiable. *Schnuelle*, 441 B.R. at 622-23. What is *not* justifiable is blind reliance where a cursory examination would have revealed the falsity of the representation. *Id.*

### 5th *Element: Whether the creditor's damages were proximately caused by the misrepresentation*

The fifth requirement is proximate cause. Proximate cause requires that the creditor would not have suffered the loss at issue but for the debtor's actions. *In re Maier*, 38 B.R. 231, 233 (Bankr. D. Minn. 1984). It also requires the creditors to prove that their loss was a foreseeable result of the misrepresentation. *In re Smithson*, 372 B.R. 913, 922 (Bankr. E.D. Mo. 2007) (citing *In re Creta*, 271 B.R. 214, 219 (B.A.P. 1st Cir. 2002)).

### Conclusion: The debt incurred on June 20, 2018 is nondischargeable pursuant to § 523(a)(2)(A)

Ms. Wernes asserts that Ms. Kroesen made a false representation when the parties signed the June 20, 2018 promissory note because Ms. Kroesen allegedly knew that the rehab project

would not be complete by August 14, 2018. The complaint further alleges false pretense in that, when Ms. Kroesen ceased payment to Crossroads and allegedly to contractors, she withheld this information from Ms. Wernes. Because Ms. Kroesen failed to correct this false impression, Ms. Wernes, not knowing of Ms. Kroesen's financial strain, agreed to the terms under the June 20, 2018 note. Had Ms. Kroesen not made these misrepresentations, Ms. Wernes argues she would have exercised her remedies to protect her investment, including completing the rehab project herself and ensuring that the property sold for the maximum amount.

"For purposes of... [§ 523(a)(2)(A)], it is true, the misrepresentation generally must 'relate to a present or past fact,' and a promise to pay in future, even if false, is not such a misrepresentation." *Brzakala*, 305 B.R. at 711 (citing *Shea v. Shea (In re Shea), 221 B.R. 491, 496 (Bankr. D.Minn. 1998)). "A promise to pay made with a *present intention* not to perform, however, will satisfy the misrepresentation requirement." *Id.* (citing *Shea*, 221 B.R. at 496); *see also McCrary v. Barrack (In re Barrack),* 217 B.R. 598, 606 (9th Cir. BAP 1998); 4 A. Resnick & H. Sommer, eds., *Collier on Bankruptcy* ¶ 523.08 [1][d] at 523–44) (emphasis in original). Ms. Wernes' complaint alleges this sort of misrepresentation.

### 1. *Ms. Kroesen made representations to Ms. Wernes*

As to the first element, that the debtor made a representation, the court finds and concludes that when Ms. Wernes agreed to extend the loan with the June 20, 2018 note, Ms. Kroesen failed to disclose that she had stopped payment to Crossroads, the first lienholder, on May 9, 2018. Ms. Kroesen's silence regarding this material fact was a representation inconsistent with the truth. Ms. Kroesen further represented, through silence, that she recorded the subordinate deed of trust. In fact, she gave Ms. Wernes a signed, notarized copy on July 24, 2017. Under the impression that her interest was properly secured, Ms. Wernes agreed to the terms in the June 2018 note. Only

when Ms. Wernes questioned Ms. Kroesen as to the status of the subordinate deed of trust, did she finally record it on June 29, 2018, albeit for an insufficient amount to cover the amount of the money loaned to date.

Third, while Ms. Kroesen originally represented to Ms. Wernes that work on the foundation was complete on October 15, 2017, Ms. Kroesen testified that she later learned that the foundation required additional work in either May or June 2018. Ms. Kroesen testified that she continued to perform work on the property until learning of the cost to repair the foundation in July or August 2018. At trial, she asserted she had not intended to deceive Ms. Wernes. Ms. Kroesen attempted to defend her decision to walk away from the project and not to advise Ms. Wernes earlier by claiming that she had to wait until she got an expert report about the cause of the foundation problem and a cost estimate of the repair and that she did continue to work on the property in the meantime in good faith. She conceded in response to Ms. Wernes' cross-examination, however, that she "couldn't find" a copy of the report or many of her receipts proving such work. The court find Ms. Kroesen's testimony simply not credible. Ms. Kroesen offered no credible explanation for her actions in June 2018 when the note was extended. In sum, whether Ms. Kroesen learned of the foundation issue in May or June 2018, she omitted telling Ms. Wernes of the foundation issues and the possible costs associated with fixing the defects.

Ms. Wernes had a right to know the material facts that Ms. Kroesen was delinquent to the first lienholder, that her security interest was not perfected, and that the foundation to the home required additional work. The court finds these omissions to be representations in connection with Ms. Wernes' granting Ms. Kroesen an extension of credit and further equates to Ms. Wernes forbearing on pursuing her legal remedies.

### 2. *Ms. Kroesen knew the representations were false*

The second element is that the debtor knew the representations were false. The court finds unquestionable that Ms. Kroesen knew that she was delinquent in her payments to Crossroads when she agreed to the terms of the June 2018 promissory note. Ms. Kroesen rehabbed at least three "flips" prior to the Donovan Property and was aware of her responsibilities to maintain her interest-only payments to Crossroads.

Similarly, Ms. Kroesen knew that the foundation required additional work. While Ms. Kroesen may not have known the extent or cost of the work, she knew that Ms. Wernes believed the foundation to be complete. Failing to inform Ms. Wernes of this potentially large-scale, high-cost project, was a false representation when the promissory note guaranteed to have the house on the market and sold in under two months.

As to the failure to record the subordinate deed of trust and representing, by omission, Ms. Wernes had a valid security interest on June 20, 2018, this court does not find credible Ms. Kroesen's testimony that she simply forgot that she failed to record the deed of trust. Again, this was not Ms. Kroesen's first flip and the court finds and concludes that Ms. Kroesen knew, when the June 2018 promissory note was agreed to, that Ms. Wernes' interest was not properly secured.

### 3. *Ms. Kroesen intended to deceive Ms. Wernes*

Relating to the third element, the court finds and concludes that Ms. Kroesen intended to deceive Ms. Wernes when she signed the June 20, 2018 promissory note. At trial, Ms. Kroesen did not deny that her payments to Crossroads were delinquent when Ms. Wernes agreed to extend credit and forebear from legal remedy. The court again notes that Ms. Kroesen's testimony, stating that she either simply forgot to record the deed of trust or forgot that the deed was never recorded, was not credible. The court also finds that Ms. Kroesen knew, at the very least, that there was a

chance that the foundation work could extend the time of the rehab. She intentionally withheld this

from Ms. Wernes in the hopes of forestalling any attempts by Ms. Wernes to enforce her rights.

While the court does believe Ms. Kroesen initially wanted to successfully rehab this home and

repay her investors, this intent does not absolve her from her later fraudulent representations.

The court finds and concludes that by failing to tell Ms. Wernes that she had stopped

paying Crossroads and had no intent to finish the project in June 2018, Ms. Kroesen intended to

deceive Ms. Wernes into again extending the note.

### 4. *Ms. Wernes justifiably relied on Ms. Kroesen's representations*

Fourth, the court finds and concludes that Ms. Wernes justifiably relied on Ms. Kroesen's

representations that she was current on her payments to Crossroads, that the foundation work was

complete, and that she held a security interest in the property. This was not the first business

relationship in which Ms. Wernes loaned Ms. Kroesen money to flip a home. In fact, until the

Donovan Property, Ms. Wernes profited from Ms. Kroesen's rehab efforts. On June 20, 2018, Ms.

Wernes had no reason to doubt that Ms. Kroesen was up-to-date on her payments to Crossroads.

As for the foundation issues, while Ms. Wernes could have investigated the home's foundation,

unless she was versed in determining structural soundness, it is unlikely that a visual inspection

would reveal any issues. Ms. Wernes was justified in her reliance as to Ms. Kroesen's

representations that she was up-to-date with Crossroads and that the foundation had been repaired.

As for the deed of trust, Ms. Wernes had no reason to believe that it was not recorded. Ms.

Kroesen gave Ms. Wernes a signed and notarized copy of the subordinate deed of trust in 2017.

Given that Ms. Kroesen, at trial, did not refute Ms. Wernes' statement that, in previous rehab

projects, she timely recorded the subordinate deed of trusts, Ms. Wernes justifiably relied on Ms.

Kroesen's representation that it was also recorded on the Donovan Property. None of the

representations relied upon evince blind reliance by Ms. Wernes and even if she investigated the representations, she may not have discovered their falsity.

### 5. *Ms. Kroesen's representations proximately caused Ms. Wernes' damages*

The final element, proximate cause, requires that Ms. Wernes would not have suffered loss but for Ms. Kroesen's actions. Ms. Wernes must prove "whether, and to what extent," her loss was proximately caused by Ms. Kroesen's misrepresentations. *In re Gilmartin*, No. 10-42094-705, 2012 WL 1804884, at *5 (Bankr. E.D. Mo. May 17, 2012). The court finds and concludes that it was certainly foreseeable that Ms. Wernes would suffer financial damages caused by Ms. Kroesen's misrepresentations.

Because Ms. Kroesen failed to inform Ms. Wernes that she was delinquent in her payments to Crossroads, that the home's foundation required additional work, and that the subordinate deed of trust was not recorded, Ms. Wernes agreed to extend the terms of the note with $4,828.26 monthly interest. By the time she learned that Ms. Kroesen could not complete the rehab, it was too late to prevent the home from going to foreclosure. But for Ms. Kroesen's misrepresentations by omission, Ms. Wernes could have mitigated her damages.

### Damages

That leaves the question of what damages to consider. In a typical nondischargeability case, where there has been a fraudulent misrepresentation of this sort, the total amount of the debt would be deemed nondischargeable as the damages. But the evidence in this case does not support that result. At the inception of the loan, Ms. Kroesen and Ms. Wernes entered into a transaction both fully intending that it would be profitable. Even after the project was delayed several times, such that Ms. Wernes agreed to extend the note, Ms. Kroesen clearly intended to finish the project in good faith, and Ms. Wernes in turn understood and agreed to the delay in payment. It was only

after the point that Ms. Kroesen realized in June 2018 that she could not complete the project did Ms. Kroesen misrepresent the situation to Ms. Wernes. That fact is reflected in the complaint, which only alleges Ms. Wernes was defrauded in the extension of the note dated June 20, 2018. In addition, Ms. Wernes did not present any evidence of her damages, including whether she attempted to bid at the foreclosure sale of the Donovan Property or received any surplus proceeds after payments of the first lien.

"Section 523(a)(2)(A) requires that to have a debt excepted from a debtor's discharge, a creditor is 'required to prove that the [debtor] obtained money or property from [the creditor] concurrent with the [debtor's] misrepresentation.'" *In re Gilmartin*, No. 10-42094-705, 2012 WL 1804884, at *5 (Bankr. E.D. Mo. May 17, 2012) (quoting *Marcusen v. Glen (In re Glen)*, 639 F.3d 530, 533 (8th Cir.2011) ("only debt that is obtained by fraudulent conduct is within the scope of § 523(a)(2)(A)."). "The timing [of the alleged misconduct] is, therefore, important." *Id*. As already noted, § 523(a)(2) "applies to a debtor who obtains an 'extension, renewal or refinancing of credit.'" *Brzakala*, 305 B.R. at 711 (quoting 11 U.S.C. § 523(a)(2)).

To calculate Ms. Wernes' damages, the court refers to a decision by the Eighth Circuit Bankruptcy Appellate Panel and a case it remanded to the Eastern District of Missouri. The question before the appellate court, in *In re Gilmartin*, was whether the bankruptcy court erred when it found that the plaintiffs failed to prove they were damaged by the debtor's fraud. 459 B.R. 720, 721 (B.A.P. 8th Cir. 2011). As background, the plaintiffs and debtor were friends and together, formed a limited liability company. *Id*. at 722. The plaintiffs initially invested $20,000 and the debtor invested $16,800. *Id*. at 723. The LLC purchased a few apartment and residential properties with the intent to replace and rebuild some of the residences. *Id*. To buy the properties, the LLC obtained two loans, personally guaranteed by both plaintiffs and debtor. *Id*. The debtor

managed the LLC in day-to-day activities, including supervising construction projects and maintaining the LLC's records and finances. *Id*. And while the parties agreed the debtor was to be compensated monthly, the first year, they disagreed whether the compensation was to extend more than a year if the projects were not completed. *Id*.

In 2006 and 2007, the debtor experienced personal financial problems and the plaintiffs loaned him $30,000. *Id*. The debtor also asked the plaintiffs to infuse additional funds into the company and they did so by taking out a $330,000 second mortgage on their home. *Id*. The entire sum went into the company from August 2008 to December 2008. *Id*. Plaintiffs contended that the debtor began taking unauthorized funds from the LLC to pay personal expenses, along with the agreed supervisory monthly fees. *Id*. The plaintiffs alleged the debtor, withdrew over $200,000 unauthorized funds from 2007 and 2008. *Id*. The plaintiffs learned of the unauthorized withdrawals at the end of December 2008. *Id*.

Ultimately, the LLC's projects failed, and the debtor filed a joint chapter 7. "While the [plaintiffs] remain[ed] liable on their bank guaranties in connection with these projects, they allege[ed]…that they would not have continued to invest funds in the project, including those from the second mortgage on their home, had they known that [the debtor] was using such funds for unauthorized purposes." *Id*.

"The linchpin of the Bankruptcy Court's Judgment in this case [was] the finding that the [plaintiffs] failed to prove the fifth element—that they sustained a loss as a proximate result of [the debtor's] alleged misrepresentations." *Id*. at 724. There was no dispute that the plaintiffs lost money. "The question for purposes of this appeal [was] whether any of their loss was the proximate result of the alleged misuse of funds." *Id*. The bankruptcy court "concluded that since the

[plaintiffs] had failed to prove that the venture would have otherwise been successful absent the alleged misuse of funds, there were no damages resulting from such misuse." *Id*.

However, the plaintiffs argued that the court "failed to consider their alternate damage argument, namely, that they would not have invested money into the LLC in the first place, or they would have ceased putting new money in, had they known that [the debtor] was taking money out for his own use." *Id*.

The B.A.P. reversed and remanded the case to the bankruptcy court to consider whether the "out of pocket" measure of damages was applicable:

> "Although the primary measure of damages for fraud in Missouri is the benefit of the bargain, as applied by the Bankruptcy Court, alternate measures are available when the bargain theory does not accurately measure the loss sustained. Under certain circumstances, an 'out of pocket' measure of damages, such as that alleged by the [plaintiffs] here, is authorized. The [plaintiffs] offered evidence that they would not have invested any money in the first place, or that they would not have continued to invest funds, had they known of [the debtor's] alleged fraud. Since the Bankruptcy Court found against them on the damages issue without considering whether the 'out of pocket' measure of damages is applicable, we reverse and remand."

*Id*. at 725 (citing *Glass Design Imports, Inc. v. Import Specialties,* 867 F.2d 1139, 1143 (8th Cir.1989); *Central Microfilm Serv. v. Basic/Four Corp.,* 688 F.2d 1206, 1220(8th Cir.1982), *cert. denied,* 459 U.S. 1204 (1983)).

On remand, the bankruptcy court begun its analysis of the § 523(a)(2)(A) action with detail as to when and how much money the plaintiffs loaned to the company. *In re Gilmartin*, No. 10-42094-705, 2012 WL 1804884, at *1 (Bankr. E.D. Mo. May 17, 2012):

- 2006: $20,000 loaned by plaintiffs as initial investment;

- 2006: $16,800 loaned by debtor as initial investment;

-   2006: As compensation for his day-to-day management, debtor was to receive "supervisory fee" of $8000 per month. The plaintiffs asserted that this amount was not to exceed $96,000 for two projects, but the debtor argued the compensation was supposed to continue if the projects were not completed;

-   2006: LLC borrowed "start-up" loan of $25,000;

-   October 2, 2006: LLC issued check to "Safeco" in the amount of $682. The debtor testified that this was a "personal loan" to himself;

-   2006-2007: Plaintiffs loaned debtor personal loans due to his financial problems;

-   2007: Debtor withdrew $5,147 from the LLC to pay his real estate taxes;

-   2008: Plaintiffs took out $330,000 second mortgage on home and contributed entire sum to LLC;

-   December 2008: Plaintiffs learned of debtor's unauthorized withdrawals.

*Id*. at *1-2. The plaintiffs alleged that the debtor withdrew supervisory fees in excess of $96,000 and additional funds for personal use. *Id*. at *2. The debtor argued that the funds he withdrew from the LLC were either authorized supervisory fees or "loans" he intended to pay back. *Id*.

The court found all elements of § 523(a)(2)(A) fulfilled and as for damages, while the plaintiffs argued that the fraud occurred from "day one," the "court [found] that [the debtor's] fraud on the [plaintiffs] commenced in October 2006, when the LLC first issued a check to Safeco for [the debtor's] personal payment." *Id*. at *5. The court opined that the record reflected that the debtor was able to obtain funds for personal use from October 2006 until the plaintiffs first learned of the fraud. *Id*. "And to be part of a 'debt ... for money, property, services, or an extension, renewal or refinancing of credit,' obtained by fraud, the contributions made by the [plaintiffs] must have been made after October 2006 and up to the time the [plaintiffs] learned of the fraud." *Id*.

44

Citing to the B.A.P's earlier holding, the court reasoned that the benefit of the bargain rule did not accurately measure the damages suffered by these plaintiffs:

> "The [plaintiffs] invested in the LLC because [the debtor] failed to inform the [plaintiffs] that he was using the LLC's funds for personal purposes. Because of the actions or inactions of [the debtor], the [plaintiffs] did not discover the fraud until years after they had started to invest in the LLC and they were unable to avoid the loss. The benefit-of-bargain measure of damages would not accurately measure the loss."

*Id*. at *6 (citing *Kerr v. First Commodity Corp. of Boston,* 735 F.2d 281, 285 (8th Cir.1984) (out of pocket theory proper where, assuming the property initially had value, defendant's actions delayed plaintiff's discovery of fraud and plaintiff was not able to avoid the losses due to passage of time); *Central Microfilm Serv. v. Basic/Four Corp.,* 688 F.2d 1206, 1220–1221 (8th Cir. 1982) (benefit of the bargain theory, difference between represented value and actual value, did not make sense where defendant induced the plaintiff to continue as a dealer of computer hardware and software packages.); *Glass Design Imports, Inc. v. Import Specialties,* 867 F.2d 1139, 1143 (8th Cir. 1989) (out of pocket damages were proper where "the defendants fraudulently induced [the plaintiff] to become and continue as a dealer [of glass products]-the harm is best measured by the net losses incurred as a result.").

"'Thus, under the ... out-of-pocket rule, a defrauded plaintiff, ..., is limited only to recovering an amount of money equal to the difference—if any—between the amount that he parted with (i.e., what he is 'out of pocket') and the actual value of that which he received.'" *Id*. (quoting 37 Am Jur 2d Fraud and Deceit, §§ 387 and 420; *see also Glass Design Imports,* 867 F.2d at 1143 (describing out of pocket damages as "the net losses incurred as a result [of the fraud]")). The court calculated damages for the non-dischargeable debt by (a) looking at the funds the plaintiffs allegedly contributed to the LLC based on fraud and determined whether the plaintiffs

45

proved that they contributed the amounts based on fraud; and (b) then subtracted from the amount

the plaintiffs contributed, the value they ultimately received. *Id.*

The court finds that the "out-of-pocket" rule is the most appropriate method to calculate

Ms. Wernes' damages. The complaint asserts Ms. Kroesen's fraud began on June 20, 2018. The

out-of-pocket sum is thus, the interest that accrued from and after the June 20, 2018 note beginning

June 14, 2018 through the date of filing on October 4, 2018, calculated as three months of interest

at $4,828.26 per month (from June 14, 2018 through September 14, 2018), plus $3,218.84,[8] a total

of $17,703.62. The court therefore finds and concludes that Ms. Wernes has met her burden of

proving that $17,703.62 is nondischargeable pursuant to §523(a)(2)(A).

### Count II: 11 U.S.C. § 523(a)(2)(B)

Ms. Wernes' complaint also alleges nondischargeability pursuant to § 523(a)(2)(B).

Section 523(a)(2)(B) of the bankruptcy code excepts from discharge a debt "for money…or an

extension, renewal, or refinancing of credit to the extent obtained by . . .  use of a statement in

writing

    (i)      that is materially false;

    (ii)     respecting the debtor's….financial condition;

    (iii)    on which the creditor…reasonably relied; and

    (iv)    that the debtor caused to be made or published with intent to deceive. . . ." 11 U.S.C.
          § 523(a)(2)(B).

In this case, there was no evidence that Ms. Kroesen provided a written statement of her

financial condition. The court finds and concludes that Ms. Wernes did not meet her burden of

proof under Count II. Judgment will be entered in favor of Ms. Kroesen.

---

[8] There were 30 days between September 14, 2018 and October 14, 2018, and twenty days elapsed before the bankruptcy filing. 20/30ths of $4,828.26 is $3,218.84.

### Court's Comment on the Presentation of Evidence

Ms. Wernes expressed her frustration with the court's restrictions on her time at several points during the trial. The court is sympathetic to her frustration as a nonlawyer. Nonetheless, the court has the authority to set reasonable rules for the presentation of evidence. *See* Fed. R. Evid. 611. Ms. Wernes' first attorney early on said a half day but withdrew and then Ms. Wernes herself stated on the record numerous times that an hour would be sufficient to present her case. At no point during any of the status conferences did she say she would need more time, and during the trial, she did not proffer to the court what evidence she would have adduced if the court had given her more time.

Although the court is certainly normally flexible in the time set for trials, in this case the court was mindful of the fact that the trial was set to start at 2:00 p.m. and end at 5:00 p.m., and that Ms. Wernes and Ms. Kroesen had a number of witnesses waiting who would have had to make a second trip to the courthouse had the court continued the trial to another day. Based on the court's knowledge of this case, the court believes 90 minutes was more than sufficient time for each side to present their case in chief and defenses, and in fact, Ms. Benedict for her client abided by and certainly relied on the limitation in how she presented her case in chief and defenses and would have been prejudiced if the court had given Ms. Wernes all the time she thought she needed.

The court believes in sum that 110 minutes was sufficient time for Ms. Wernes to have presented all the evidence she needed to present had she been more organized and allocated her time more wisely between her case in chief on the dischargeability and her defense on the stay violation. As an example, she wasted precious time attempting to convince the court to play a video of Ms. Kroesen talking on some sort of media broadcast about her unsavory past and wanting to ask Ms. Kroesen how much she got paid for the interview. The court properly excluded the

video and related testimony as irrelevant to the issue at hand: whether Ms. Kroesen defrauded Ms.

Wernes in 2018.[9] As the court warned Ms. Wernes many times during the course of these

proceedings, even pro se litigants are held to the same rules and standards as lawyers should they

choose to represent themselves. The court is simply at a loss to fathom, had she given Ms. Wernes

unlimited time, what other evidence Ms. Wernes could have adduced, besides evidence that would

have been mostly irrelevant, cumulative or prejudicial, and therefore inadmissible. Fed. R. Evid.

403.

## CONCLUSION

Because the court finds no violation of the automatic stay, the court will enter Judgment in

favor of the defendant, Ms. Wernes, in Adversary Proceeding 19-04022. Because the court finds

that Ms. Kroesen, through her false representations and false pretenses, obtained an extension of

credit from Ms. Wernes, the court will enter Judgment in favor of the plaintiff, Ms. Wernes, in

Adversary Proceeding 19-04003 on Count I of the complaint and determines the sum of

$17,703.62 nondischargeable pursuant to § 523(a)(2)(A). Judgment against Ms. Wernes will be

entered on Count II.

Separate judgments will issue.

**/s/ Cynthia A. Norton**
Judge Cynthia A. Norton

Dated: 5/1/2020

---

[9] Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) *the fact is of consequence in determining the action*.") (emphasis added). Ms. Wernes argued that the video showed Ms. Kroesen could make additional income from selling the story about her past. Although that *may* have been relevant to Ms. Kroesen's disposable income and good faith in confirming a chapter 13 plan, the plan has been confirmed. And the possibility, assuming it is one, that Ms. Kroesen could sell her story is in no way relevant, again, to whether Ms. Kroesen defrauded Ms. Wernes in connection with the June 20, 2018 note.